### THE ADELE THACKERA, Etc.

(*District Court, S. D. New York.* August 6, 1885.)

**1. JETTISON—GOODS VALUELESS IN THEIR SITUATION.**

    To recover contribution for jettison the sacrifice must be voluntary; if the goods have, through a sea peril, become practically irrecoverable and valueless, subsequently cutting them loose will not sustain a claim for contribution.

**2. SAME—LUMBER WASHED OVERBOARD—LASHINGS CUT.**

    Where lumber on deck was partly washed overboard in a gale, but more or less of it remained attached to the vessel by its lashings, which were afterwards cut loose, *held*, upon the evidence, that before the lashings were cut the lumber was practically lost by a sea peril; that it was of no pecuniary value in its then condition, and afforded no just claim for contribution as for jettison.

**3. CHARTER-PARTY—SUBSEQUENT CHANGE OF MASTER, WHEN VALID.**

    Under a charter-party executed by the master, who is described therein as "party of the first part," which contains no *express* statement or covenant that he shall sail as master for the contemplated voyage, there is no *implied* warranty to that effect, when the evidence does not show that the master's personal services were one of the inducements to the contract. *Held*, therefore, that in such a case the subsequent appointment of a new and competent master for the voyage, without notice to the charterer, did not affect the obligations of the contract.

In Admiralty.

*E. D. McCarthy*, for libelants.

*Jas. K. Hill, Wing & Shoudy*, for claimants.

BROWN, J. This libel was filed to recover some $1,800, the share of the schooner and freight towards contribution for an alleged jettison of lumber during a voyage of the Adele Thackera, in November, 1883, from Brunswick, Georgia, to New York. Upon the trial an amendment of the libel was allowed so as to include an independent claim for the loss of the lumber, on the ground that the master named in the charter had put the vessel on this voyage in charge of the mate. The schooner took a part of the lumber on deck, as customary, and sailed from Brunswick on November 9th. On the 13th the entry in her log shows that she encountered heavy weather. The entry reads as follows: "At 4 A. M. tremendous high cross-sea; vessel shipped much water. At 5 A. M. deck-load started, and went off down to the rail; got fouled up in running gear; had to cut gear and deck-load lashings to let it get clear. * * * The wind afterwards moderated, but again became a gale on the 14th." The log of that date contains the following: "At 5 A. M. blowing a gale from W. S. W. What lumber was left on deck got adrift, and with hard work kept it from breaking our pumps, while sea after sea washed it overboard. Some we had to cut to get clear of rigging. * * * 15th. At 6 P. M. everything movable gone from deck." The vessel arrived at New York on the 23d. The protest sworn to the same day runs in nearly the same words: "November 13th, 4 A. M. Tremendous high cross-sea running; vessel laboring hard and straining badly. 5 A. M. shipped an immense sea, which started the deck-load adrift; got fouled up in

our running gear; was obliged to cut our deck-load lashings, and let it go clear; lost load down to rails."

Upon the trial the acting master, Connell, and the first mate, both testified that there were but a few sticks that were fouled with the running gear, and which, from swinging back and forth, had to be cut, and that all the rest was washed overboard and lost. Counsel for the libelant urge that this testimony is so clearly contrary to the statements of the log and protest that it should not be credited.

Without considering the question whether the jettison of the deck-load, though shipped in accordance with the custom, gives rise to a claim for contribution, (see Macl. Law Shipp. 668; 1 Pars. Shipp. & Adm. 353, 354; *Cram* v. *Aiken*, 13 Me. 229; *Hazleton* v. *Manhattan Ins. Co.* 12 Fed. Rep. 159,) to constitute such a claim, the jettison must have been a voluntary sacrifice. 1 Pars. Shipp. & Adm. 346–351. If the lumber, in the condition which it had come to occupy through a peril of the seas, at the moment when the cutting of the lashings took place, was practically irrecoverable and of no value, then the cutting of the lashings, which was the only voluntary act, did not properly cause the loss of the lumber. Practically it was lost already. The cutting of the lashings did not cause the loss of anything having then any value, and hence would not be a ground of claim. Stev. Av. 15; *Nickerson* v. *Tyson*, 8 Mass. 467; *Johnson* v. *Chapman*, 19 C. B. (N. S.) 563; *Shepherd* v. *Kottgen*, 2 C. P. Div. 585, (C. A.)

The language of the log and of the protest give no support to the belief, in the face of the testimony, that anything, except a few sticks not already washed overboard, was cut away. It is not credible, indeed, that one-third of the deck-load, which was above the rail, could actually hang overboard and remain along-side for any considerable time by such lashings. I conclude, therefore, that the apparent discrepancy between the log and the testimony arises from the very brief and ambiguous form of the entries. The mate testified that he cut away but one lashing, and that that was what he meant was cut loose; not that the deck-load was cut loose. But even if the whole deck-load were hanging overboard after it had "gone off," as the log says, " down to the rail," I must deem it, in that position, practically irrecoverable and valueless, and not a ground of claim as for a voluntary jettison upon the subsequent cutting of the lashings. The question is fully discussed in *Shepherd* v. *Kottgen, supra.*

Upon the second ground of claim I am also satisfied that the libelant is not entitled to recover. The charter-party is dated September 27th. It purports to be made between J. P. Kinney, master, of the first part, and the libelants, of the second part. It agrees to freight and charter the vessel, then in New York, for a voyage from Brunswick to New York. There is no covenant that Kinney shall be the master for the voyage, nor any statement as to who shall sail as master; but only that the vessel shall be "tight, staunch, strong, and in every

way fitted for the voyage." Kinney was not previously known to the charterer, and it is clear that the personal services of Kinney as master were not an inducement to the contract. The description of "Kinney, master," as the "party of the first part," is not a warranty that he shall sail as master on the voyage referred to, but only that he was master at that time and competent to make the contract. The case is therefore the same in effect as if the owners had been the persons named as parties of the first part, with no mention of the master's name; and, in that case, it is clear that a change of master by the owners after the charter was signed would not have been a breach of any express or implied warranty. By the French Code de Commerce, § 273, it is required that the master's name shall be stated in the charter. Nevertheless, even under such a requirement of law, it is held by the French courts that unless the personal services of the master named were an inducement to the contract, a change of master before sailing does not entitle the charterer to rescind the contract. 1 Valroger, Comm. du Code de Com. § 286; 2 Valroger, Comm. du Code de Com. § 679.

Much stronger is the case for the owners where there is no law requiring any statement of the master's name, and where the usual form of charter-parties does not embrace any such statement. See Macl. Law Shipp. 360. The former mate of the vessel was, in this case, duly appointed captain for this voyage. He signed the bill of lading for the lumber as master, and he is described as "master" in it. He was master for this voyage, and the evidence is that he was fully competent.

I cannot sustain the libel on either ground, and there must be judgment for the defendant, with costs.